The amounts claimed to be due are for income and excess profits taxes with interest for the years 1920, 1921, 1922 and 1923, aggregating in the neighborhood of one hundred and fifty thousand dollars.
The taxes in question were severally assessed in differing amounts by the Commissioner of Internal Revenue against five corporations which, after transferring all their assets and liabilities, either mediately or immediately, to the respondent corporation, were duly dissolved. These corporations were:
Live Poultry Transit Company of Illinois. It was organized in 1913, transferred its assets and liabilities to Live Poultry Transit Company of Delaware (not the respondent) in December, 1921, and was dissolved in February, 1922.
Equipment Devices Company of Maine. It was organized in 1916, transferred in 1923 all its assets and liabilities to a Delaware corporation of the same name incorporated in that year (which in turn conveyed all of its assets and liabilities in January, 1930, to the respondent), and was dissolved in January, 1924.
Equipment Corporation of Maine. It was organized in 1920, transferred all its assets and liabilities in December, 1921, to Live Poultry Transit Company of Delaware (not the respondent), and was dissolved in March, 1922.
New City Car Company of Maine. It was organized in 1920, transferred all its assets and liabilities to a Delaware corporation of like name in 1923 (which in turn conveyed all its assets and liabilities to the respondent in January, 1930), and was dissolved in January, 1924.
Live Poultry Transit Company of Delaware (not the respondent). It was organized in December, 1921, transferred all its assets and liabilities to Poultry Car Company of Delaware in 1923, and was dissolved in 1924. The Poultry Car Company was incorporated in 1923 and later amended its certificate of incorporation by changing its name to Live Poultry Transit Company. Under this name *Page 803 
it was duly dissolved in 1930, and this court appointed trustees for it in dissolution, the dissolution cause being the one above stated in the caption.
It will thus be seen that the respondent corporation has either directly or indirectly come into possession of all the assets of the above named five corporations against which the taxes in question were assessed. It is not denied that it is liable as the transferee of those assets to any income and excess profits taxes that were assessed against the predecessor companies, provided the assessments were duly made.
By virtue of section 280 of the Revenue Act of 1926 (26 USCA § 1069) it, as transferee of a taxpayer, is liable to the extent of the property transferred to it by a tax-payer for the taxes imposed by income and excess profits statutes upon its transferror tax-payer. No proceedings were ever taken against it to assert its liability other than the one here involved, which takes the form of a claim made against its trustees in dissolution to have the taxes alleged to have been assessed against its predecessors paid out of the assets in hand. No sixty day notice was ever served on it for the purpose of assessing its liability as a transferee.
It is conceded that the claim filed should be disallowed unless the government can bring the assessments made on May 3, 1930, against the five transferror corporations within the period of limitations applicable to each of them.
Returns were filed for the years 1920, 1921, 1922 and 1923 on behalf of all five of the companies in question on March 29, 1921, September 15, 1922, October 15, 1923, and June 12, 1924 respectively. These returns were in the form of a consolidated return filed by "Equipment Devices Company and Associated Companies," the Devices Company being the parent and the others, subsidiaries. The taxes disclosed to be due on these returns were paid.
An examination of the books and records of the five companies was made by an examiner representing the Bureau of Internal Revenue who reported on May 8, 1926, and recommended the assessment of additional deficiency taxes against each of the companies. The additional taxes so recommended to be assessed were thereafter assessed on May 3, 1930, and it is these taxes which are now sought to be allowed as a claim in this dissolution proceeding.
The defense to the government's claim is based on the contention that the taxes were not assessed against the five taxpayer companies within the period of limitations prescribed by the applicable internal revenue acts. Taxes assessable for the year 1920 are required to be assessed, and proceedings for their collection without assessment are required to be brought, within five years after the return was filed; and for the years 1921, 1922 and 1923, the taxes are required to be assessed, and proceedings for their collection without assessment are required to be brought, within four years after the filing of the returns. Revenue Act of 1926, 44 Stat. at Large, c. 27, § 277, 26 USCA § 1057.
The statutory period of limitation both for assessment and proceedings without assessment for collection of the 1920 taxes therefore expired on March 29, 1926, of the 1921 taxes on September 15, 1926, of the 1922 taxes on October 15, 1927, and of the 1923 taxes on June 12, 1928. As before stated, the assessments for each of those years were made on May 3, 1930, a date well after the period of limitation had expired.
The government, however, contends that the apparent bar which the lapse of time seems thus to interpose is not in law operative against it. The contentions in support of this position will now be examined.
It is claimed that agreements were signed by the taxpayers and the Commissioner of Internal Revenue in accordance with the provisions of section 278 (c) of the Revenue Act of 1926 (26 USCA § 1060), which provides that when such agreements are entered into in writing, assessments may be made at any time prior to the expiration of the period agreed upon; that such waivers were signed for the years of 1920, 1921 and 1922 whereby the time was extended to December 31, 1927; that for the tax year of 1923, the four year period did not expire until June 12, 1928; that on November 12, 1927, a date within the limitation periods (extended by waivers for three of the years and original for the last), notice was given of a deficiency tax as provided by section 274 (a) of the Revenue Act of 1926 (26 USCA § 1048); that within the sixty day period allowed by that section an appeal was taken to the Board of Tax Appeals; that by virtue of section 277 (b) of the Revenue Act of 1926, as amended by the Revenue Act of 1928, § 504 (a), 26 USCA § 1057
(b), the running of the statute was suspended during the pendency of the appeal and for sixty days after a final decision thereon by the Board; that the Board handed down a final decision dismissing the appeal on March 29, 1930; that the assessments were made as stated on May 3, 1930, and thus were within the statutory period of limitations as suspended.
This statement of the argument by which the government seeks to sustain its claim, requires an examination of two questions — one presented by the waivers and the other by the appeal to the Board of Tax Appeals. *Page 804 
[1, 2] First as to the waivers. When as here the statutory period has run, that fact is prima facie evidence that the tax payer is not liable to assessment. Upon such a showing, the burden rests on the government to show that the statute has not run. If waivers are relied upon, it is incumbent upon the government to establish them as valid. White Eagle Oil Refining Co. v. Commissioner, 19 B. T. A. 185; Godfrey v. Commissioner, 18 B. T. A. 775.
[3] In the case of Equipment Corporation of Maine against which a deficiency tax of $3,766.73 was assessed for the year 1921, the statutory period of four years expired on September 15, 1926. No agreement extending the time for assessment in the case of that company appears ever to have been signed by anyone purporting to act in its behalf. The assessment which was made on May 3, 1930, was therefore unaided by anything in the nature of a signed waiver. The taking of an appeal after a deficiency notice to it could not have the effect of suspending the running of the statutory period, because when the notice was mailed in November, 1927, the period had been exhausted for one year. The taking of an appeal suspends a running period. It does not create a new period.
In the case of Live Poultry Transit Company of Illinois, against which deficiency taxes were assessed in May, 1930, for the years 1920 and 1921, the statutory period expired on March 29, 1926, and September 15, 1926, respectively. On January 26, 1926, an alleged waiver was signed by "Live Poultry Transit Co. Taxpayer, by L. H. Rublee, Vice President" and by the Commissioner, extending the time within which assessments could be made against "Live Poultry Transit Company, Subsidiary, of Illinois," for the year 1920 until December 31, 1926. The corporate seal affixed to the waiver shows clearly that the "Live Poultry Transit Co." which executed the waiver was a Delaware corporation. On the date when the waiver was signed the records in possession of the Bureau of Internal Revenue showed the taxpayer was an Illinois corporation. Whether Mr. Roblee had been an officer of the Illinois corporation does not appear. Other waivers were signed on June 10, 1926, and October 14, 1926, for the year 1920 and also for 1921, purporting to extend the time within which assessments could be made against Live Poultry Transit Company until December 31, 1927. That the taxable was an Illinois corporation was plainly notified to the Bureau by the 1921 return which set out the state of the taxable's domicile. The waivers, however, were signed by a corporation of the same name to be sure as the taxable, by Frank X. Mudd, its president, and John R. Gott, its treasurer, but with a corporate seal affixed showing the domicile of the signing corporation to be Delaware and disclosing on its face the year 1923, the year of the respondent's incorporation. When these two waivers were executed the taxpayer, the Illinois corporation, had in December of 1921 transferred all its assets to a Delaware corporation of the same name (not the respondent) and had been dissolved in 1922. The Delaware corporation had also transferred all its assets in 1923 to Poultry Car Company of that state, and had become dissolved in 1924. The Poultry Car Company changed its name to the one that had been used by the Illinois corporation and by the first Delaware company, that is to Live Poultry Transit Company. So that the waivers for both years were signed by a corporation that was not in existence when the taxes accrued.
Deficiency taxes were also assessed in May, 1930, against "Live Poultry Transit Co." for the year 1922. The statute barred an assessment for that year after October 15, 1927. The Live Poultry Transit Company described in the return is disclosed to be a Delaware corporation. It is the first Delaware corporation of that name and had acquired in December of 1921 all the assets of the Illinois company of similar name for which the returns for 1920 and 1921 were filed. A waiver of the time for making assessments against the Delaware company for 1922 was signed extending the time to December 31, 1927. This waiver was the same one as is referred to in the next preceding paragraph in connection with the year 1920, the two years 1920 and 1922 being covered in the same waiver. Deficiency taxes were also assessed in May, 1930, against the Live Poultry, Company of Delaware (the first Delaware company of that name, just referred to — not the respondent) for the year 1923. The applicable statutory period expired on June 12, 1928. No waiver was obtained for the year 1923.
In the case of Equipment Devices Company, against which deficiency taxes were assessed in May, 1930, for the years 1921 and 1922, the applicable statutory period expired on September 15, 1926 and October 15, 1927, respectively. On June 10, 1926 and October 14, 1926, two waivers were signed, one for each of the years 1921 and 1922 extending the time to December 31, 1927, within which any assessment could be made. These two waivers were signed, one by "Equipment Devices Company by Frank X. Mudd" and the other by "Equipment Devices Company, by William F. Abbott and Arthur F. Carver, Treasurer." The corporate seal of the signing company was affixed to each waiver. The seal showed on its face that the signing company was a Delaware corporation. The taxpayer however was disclosed by the filed report to be a Maine corporation. The Maine corporation had conveyed all its assets to a Delaware *Page 805 
corporation of the same name and had ceased to do business in 1923.
In the case of New City Car Company, against which deficiency taxes were assessed in May, 1930, for the year 1921, the applicable statutory period expired on September 15, 1926. On June 10, 1926, a waiver was signed extending the assessable period to December 31, 1927. This waiver was signed by "New City Car Company, Taxpayer by L. H. Roblee." The corporate seal of the signing company was affixed to the waiver, and showed on its face that the signing company was a Delaware corporation. The taxpayer however was disclosed by the report to be a Maine corporation. The Maine corporation had conveyed all its assets to a Delaware corporation of the same name and had ceased to do business after 1923.
[4] The foregoing statement of facts shows that the waivers which are relied on to extend the statutory period within which assessments could be made, are waivers that were not signed by the taxpayer. In every instance they were waivers signed by the taxpayer's transferee. When in order to establish a tax claim against assets in the hands of a transferee, the government relies on the liability of the taxpayer to be assessed, the right to assess the taxpayer must not have been barred by the statute of limitations; and any waiver purporting to extend the period within which the assessment may be made, must be a waiver signed by the taxpayer or his duly authorized agent. The burden of showing such a waiver rests on the government as before stated. An unauthorized waiver signed by the taxpayer's transferee is not sufficient to extend the time. Bamberg Cotton Mills Co. v. Commissioner, 8 B. T. A. 1236; Carnation Milk Products Co. v. Commissioner, 15 B. T. A. 556; Barron-Anderson Co. v. Commissioner, 17 B. T. A. 686. The solicitors for the government apparently concede that this is the well settled rule which the Board of Tax Appeals has consistently adhered to.
No agency is shown to have existed by which the corporation's signing the waivers were authorized so to do by their predecessor taxables. Nor has the government shown that the transferee corporation had power to act for its transferror corporations, which had been dissolved, by virtue of any law of the state of the dissolved corporations domicile. Ordinarily, the law elsewhere is as here, that where a corporation is dissolved, its directors are vested with power to act for it in the winding up process, or trustees or a receiver are provided for to act in its behalf. The complete history of the various corporations embraced within the group we are dealing with, the transfers of property from one to another and all the details connected with their intercorporate activities, were known to the agents of the Bureau of Internal Revenue. That this is so is evident from the report of the examining officer who spent over two months examining into the entire situation. His report (Exhibit 10) is dated May 8, 1926, and recites the history of each corporation, the place and date of its incorporation, when each disposed of its assets and to whom, and the discontinuance of business by each. Even if it be conceded that on the faces of the waivers obtained January 26, 1926, by which the period of limitations was extended for the year 1920 to December 31, 1926, the waivers were good (which I think is not permissible) — but even conceding the fact, yet when further waivers were requested, the government was in full possession of all the facts and must be taken to have known as a matter of law that waivers from the transferee corporations were ineffectual to operate against the taxpayer-transferrors. It apears from the examining officer's report of May 8, 1926, that he, fresh from acquiring an intimate knowledge of all the facts, himself forwarded a waiver for 1921 extending the time to December 31, 1927. When the last waivers were obtained on June 10, 1926 and October 14, 1926, by which the time was extended to the last named date (conceding the earlier ones to be good), the government, therefore, was fully informed of every material fact and had ample time to insist on either proper waivers or to give the sixty day deficiency notice. If it erred in the sort of waivers it should have received, the error was one solely of law and was in no wise attributable to the fraud or concealment of either the taxpayers or their transferees.
[5] I know of no case which holds that an estoppel, for which the government contends in this case, can be held to arise where the conduct on which it rests is the conduct of the party claiming the benefit of the estoppel in mistakingly judging, as here, what the rules of law are, and where no element of fraudulent concealment or misrepresentation on the part of the other party is shown.
I hold that the waivers were ineffective to extend the time within which the assessments could be made to December 31, 1927. Had the appeal which was taken gone on to a final decision and not been dismissed for want of jurisdiction, the Board of Tax Appeals, under its well settled rulings, would have found the claims barred by the statutory period of limitations and therefore denied to the Commissioner the right to complete the assessments to which his deficiency notices referred.
This conclusion adversely disposes of the claims for 1920, 1921 and 1922 to which the alleged waivers relate.
[6] As to the year 1923, for which a deficiency notice is claimed to have been sent to *Page 806 
the taxpayer on November 12, 1927, and therefore before the original statutory period expired on June 12, 1928, an extension of the time for the assessment is argued to have been effected by the appeal to the Board of Tax Appeals taken on January 6, 1928, by the respondent and Mudd, Gott and Jennings. If that appeal was properly taken, then by virtue of section 277(b) of the Revenue Act of 1926 as amended by section 504 (a) of the Revenue Act of 1928, the running of the statute was suspended until sixty days after final decision by the Board. The difficulty with the appeal was that it was not taken by the taxpayer. It was taken by three individuals and the respondent, the transferee of two of the taxpayers and the transferee of the transferee of the three other taxpayers. The appeal was therefore improperly taken and the Board dismissed it on March 29, 1930, for lack of jurisdiction. Where there is no attempt to assess a tax against a transferee as such, but the attempt is to assess the tax against his transferror, the transferee is not the taxpayer and is therefore not entitled to take an appeal against a proposed deficiency assessment. Bisso Ferry Co., Inc., v. Commissioner, 8 B. T. A. 1104; American Arch Co. v. Commissioner,13 B. T. A. 552; Sanborn Bros. v. Commissioner, 14 B. T. A. 1059; San Joaquin Fruit, etc., Co. v. Commissioner, 16 B. T. A. 1290; Carnation Milk Products Co. v. Commissioner, 15 B. T. A. 556.
[7] I understand the government to contend that the language of section 277 (b), Revenue Act 1926 as amended by the Revenue Act of 1928, § 504 (a) — "and in any event, if a proceeding in respect of the deficiency is placed on the docket of the Board, until the decision * * * becomes final" — which language defines a portion of the time during which the running of the statute is suspended, is broad enough in its literal scope to embrace the appeal that was taken in this case, for, if I comprehend the argument, the mere placing of a proceeding on the docket of the Board is not by the quoted language required to be by the "taxpayer," and so may be by a technically non-interested party. The appeal in question, therefore it is argued, notwithstanding the petitioners, appellants, were not the taxpayer, operated to suspend the running of the statute. This argument is not acceptable. Its fallacy it seems to me is apparent when the section is read in connection with section 274 (a) of the act, as it must be, for the running of the statute is suspended under section 277 (b) only in case a deficiency notice has been mailed to the "taxpayer" as provided in section 274 (a) who by said section is alone given the right to appeal to the Board.
The so-called appeal was no appeal in law. The parties that assumed to take it were mere interlopers. The government had the right to disregard it. It had in its possession the facts showing the gratuitous character of the petitioning appellants. Assuming the waivers to have been effective so as to extend the assessable period to December 31, 1927, for the 1920, 1921 and 1922 taxes (an assumption which for the reasons before given I think unwarranted) — yet assuming the period to have been properly so extended, the government, if it had disregarded the appeal had one hundred and twenty days after November 12, 1927, within which to make the assessment. It did not do so. The period of limitations, not being further extended by the futile appeal, therefore expired on March 12, 1928. This is on the assumption that the waivers were good. As to the 1923 taxes, the period, assuming that a sixty day notice was given to the taxpayer, ran out on March 12, 1928, being one hundred and twenty days after the deficiency notice was dated. The petition in appeal filed on January 6, 1928, added to the information already in the possession of the government by showing on its face that the appellants were not the taxpayers. Had the government treated the appeal as nugatory as it had a right to do, it had enough time in which to make the assessment for that year. Making it in 1930 was far too late to be within the statutory period.
As to 1920, 1921 and 1922, therefore, the conclusion is first, that the waivers were ineffectual to extend the period of limitations; but even if they were not, the utmost boundary of the period was one hundred and twenty days after November 12, 1927, that is until March 12, 1928, as it also was for the year 1923; and the appeal was ineffectual to extend the period any further. The assessments having been made on May 3, 1930, were too late.
[8] Two more points need to be noticed that were discussed at the argument. One is that the respondent is estopped from denying that the appeal was a valid one. This does not appear to me to be tenable. The facts were in the possession of the government and if it was in any wise misled by the appeal it was so misled by its own view of the law. There was no inequitable conduct on the part of the respondent which was of a character to estop it from relying on its rights.
[9, 10] The other point that was made is that equity should regard the transfers of assets made from one corporation to another which the record discloses to have been such as to amount to a series of consolidations of corporations so that at the end of the series we find all the predecessors merged into the respondent. The only thing that lends countenance to this view is the fact of the transferring of assets in the course of reorganizations. If this amounts to a consolidation of *Page 807 
corporations in the sense that the new company absorbs the identity of the transferring ones so that the former can act in all things for the latter, then it is difficult to see on what principle the cases hereinbefore cited can stand, for if such be the law waivers by the transferee would be waivers by the transferrors and an appeal by the one would be an appeal by the other. As a matter of law, there could have been no statutory merger of the Delaware respondent with its predecessor corporations of Illinois and Maine. That there can be de facto consolidations or mergers for certain purposes is held in the cases cited by the government. The authority of Thompson on Corporations (3d Ed.) vol. 8, p. 91, is however to the effect that there can be no consolidated corporation de facto where there can be no de jure one. The extent to which the doctrine of de facto mergers is carried by the cases cited by the government is that where there has been a sale of all its assets by one corporation to another, the stockholder of the former becoming stockholders in the latter, notwithstanding there was no technical merger or any statutory authority for one, yet the transferee corporation will be held to a liability for its transferror's debts. In the instant case, there is no need to resort to this de facto doctrine to establish the fact of liability. The Revenue Act itself does-that. There is, therefore, no question of the liability. Our sole question is whether or not it has been asserted in a proper manner and within the proper time. In Phillips, Collector, v. Lyman H. Howe Films Co. (C.C.A.) 33 F.(2d) 891, a waiver signed by a transferee was held valid as binding its transferror. But in that case there had been a merger de jure under the Pennsylvania statute, whereby the two corporations became one. No such situation is found in the instant case.
Order disallowing the claims.
 *Page 130